## Nowotarski v. Matz

510

C.P. of Berks County, no. 5353-93 A.D.

*John A. Hoffert Jr.,* for plaintiff.
*Mary C. Favinger,* for defendant.

GRIM, *J.,* June 7, 1996—The matter before the court is a custody dispute. The following are the pertinent facts.

Plaintiff, Michael L. Nowotarski, and defendant, Susan Matz, are the parents of a son, Michael Lee Nowotarski, born May 28, 1990. The parties were never married, but they have lived together. The child is now in kindergarten where he attends morning sessions. Defendant wants sole legal custody of Michael because she believes that plaintiff cannot communicate with her or compromise on anything regarding Michael.

Under the present temporary custody order the parties share legal and physical custody of their child. Until recently Father worked 3 p.m. to 11 p.m. He had custody of Michael during the week until 2:30 p.m. when he would take the child to one of his grandparent's residences where Mother would pick the child up after work.

Father now works third shift from 11 p.m. to 7 a.m. He changed shifts to be able to spend more time with Michael since he is in school. Father meets the child at the bus stop after school and keeps him until Mother can pick him up after work. Father provides lunch and supper for the child. The exchange of the child occurs at the Cumru Township Police Department. Father also receives custody of Michael on alternate weekends from Saturday morning until Sunday evening.

Mother testified to many examples of Father's intransigency and controlling behavior. Mother had wanted Michael to attend a preschool to acquire some socialization skills before he started kindergarten. Father had contended that Michael did not need to attend a preschool and had refused to allow the child to participate in any. Father subsequently had enrolled Michael in a local church group without first discussing the issue with Mother. Mother had to seek court intervention to have Michael attend a mutually acceptable preschool.

Father also tried to enroll Michael in kindergarten in the school closest to his residence after the parties had already agreed that the child would attend the school closest to Mother's house since Michael sleeps at Mother's residence and leaves for school from her house. Mother had to seek court intervention to resolve this conflict.

Mother testified that Father is verbally abusive to her in the child's presence. Father calls her names such as "slut," "whore," and "bitch."

Mother is afraid of Father and obtained a protection from abuse order against him. She testified that he has pushed her during custody exchanges and inflicted bruises on her. Father denied shoving Mother. He alleged that he had tripped and fallen into her.

Many problems occurred concerning the exchange of the child. Since there is a protection from abuse order in effect between the parties they are not to have any contact and exchanges of the child are to take place in public places. The regular exchange point is the Cumru Township Police Department. However, if Mother is late even if only by several minutes, Father leaves with the child. Mother then has to find him. For example, Father tells her to meet him at the police department but he takes the child to a different police department or goes to a mini-market further away than the logical choice. Mother has driven an extra 30 miles in one day trying to get the child.

Sometimes Father insists that Mother pick Michael up at his home. Mother does not want to go to Father's residence because she is afraid of and intimidated by him.

Judith Matz, the maternal grandmother, testified that Father has refused to turn the child over to her and has held the child tight against him when she has come

to pick up Michael when Mother has been late. If Ms. Matz refuses to leave without Michael, Father threatens to call the police to have her arrested. Father testified that he will not give Michael to another person, including Ms. Matz, because only he and Mother are the child's parents. If Mother is late he will just wait for her.

Father sometimes refuses to allow Michael to walk to Mother at the exchanges. Father wants either to carry the child to Mother or to have Mother approach him for the child. If Mother refuses to accommodate Father, Father then tells Michael that Mother does not want him. Father denies that he makes this statement to Michael. He did not, however, deny his behavior.

Father has interfered with Michael's school bus transportation. Several times Father attempted to grab the child from his maternal grandmother while they were waiting for the bus in the morning. During these episodes Father yelled epithets at Ms. Matz such as "fucking asshole" and "goddamn bitch." Father sometimes takes Michael off the bus at school instead of picking the child up at the bus stop. Father testified that he does these things because he wants to spend more time with Michael and Michael does not miss anything by not riding on the school bus.

Father also interferes with Michael's medical and dental appointments. Mother makes appointments for the child and takes off from work to take him only to find out that Father cancelled her appointments and made his own without informing her.

Father makes harassing telephone calls to Mother. He calls her 15 to 20 times a day with weak excuses for the calls.

Ms. Matz testified that Father calls her every time he believes that she has Michael. In December 1995, Mother and Michael stayed overnight at her home so

she could care for Michael during the time Mother was at a Christmas party. Father called her at 10 p.m. to speak to the child but Ms. Matz informed him that Michael was sleeping. At 11 p.m. Father came to her residence and banged incessantly on her door for 10 to 15 minutes. Ms. Matz's son called the police. An officer talked to Father prior to his leaving.

Mother plays in a volleyball league. Since Father worked during the games, Mother had Ms. Matz watch Michael if Michael did not want to attend the games. Sometimes Father would telephone Mother at the games and insist that she be gotten off the court to talk to him. When she came to the telephone he harangued her for not asking him to take care of Michael. Sometimes Father called her from work.

On one occasion when Ms. Matz was watching Michael, Father made several telephone calls to talk to the child. Michael and Father had several conversations. That same evening as the child was preparing for bed, Father knocked on the door, shoved Ms. Matz aside when she opened the door, grabbed Michael, and took the child even though it was not Father's custody period.

Following a contempt hearing in November 1994, the parties were directed to attend co-parenting counseling. Their counselor advised them to do a family activity once a month. The parties did activities together, including going on a summer vacation in 1995. During this vacation the parties did not sleep together. Mother testified that she did most of the activities for her son's sake and to appease Father because he became vindictive whenever she attempted to end their relationship.

The court had the parties fill out custody/visitation questionnaires. The court notes that Father was not truthful in answering all the questions. Father answered that he enjoys perfect health; he failed to mention that he

suffers from a back problem which flares up sporadically causing him to take prescription pain medication and that he has problems associated with carpal tunnel syndrome.

Father did not answer any questions concerning the existence of a criminal and traffic record even though approximately 10 years ago he was convicted of vehicular homicide and driving under the influence of alcohol. Father testified that he "forgot" about this incident.

Father stated that he does not drink at this time, although on cross-examination he admitted that as recently as Christmas Eve in 1995 he had consumed wine at his brother's party. He was never recommended to be a candidate for drug and alcohol counseling.

The last time the parties engaged in sexual intercourse was early in 1996. Mother testified that she had tried to end the parties' physical relationship sooner; however, she is afraid of Father and is easily intimidated so she sometimes acquiesced when he approached her for sexual intercourse. After speaking to the custody evaluator and her own therapist Mother became adamant about ending their relationship. Since she stopped acceding to all of Father's demands, Mother testified that Father has made her life intolerable.

Mother further testified that to prevent herself from being bullied by Father she refuses to go to his home to pick up Michael. Despite an agreement to limit telephone contact between the hours of 7 a.m. and 9 p.m., Father calls Mother outside those hours. Mother stopped answering his telephone calls made at unreasonable times. Mother keeps her answering machine on, however, and Father has left rude messages for her on it.

Father also tries to insinuate himself in Mother's life by other means. On February 6, 1996, Father sent

her 34 roses on her birthday. On February 14, 1996, Valentine's Day, Father sent her one dozen roses accompanied with a note expressing his love for her.

Mother believes that Father uses Michael to encourage a relationship between the parties. For example, when they met accidentally at one of Michael's functions, Father gave Michael money to buy Mother ice cream. Father told Michael that he had sent Mother flowers. Father also suggests activities for them to do as a family in the child's presence.

Father claims that Mother approaches him for sexual intercourse and he merely obliges. Mother usually speaks first to him so he answers her to be civil.

Father's mother, Ms. Nowotarski, testified that Father is a good father and that he and Michael are close. She related that Mother calls her frequently to ask questions and tells her that she is not allowed to speak to Father directly.

Ms. Nowotarski admitted that on at least one occasion Father forcefully grabbed her. She could not remember if he had threatened her, but she believes that "she got what she deserved" because she interfered in one of Father's decisions.

Lynne Mullis M.S.W., performed the child custody evaluation. She submitted her initial evaluation on August 10, 1994, and gave an updated report in 1996.

Ms. Mullis testified that Father firmly believes that it is his right to take care of the child when Mother is unavailable even if it is not during his scheduled period of custody. She finds that Father is extremely controlling and uses any means he can to meet his own personal needs. Father related to Ms. Mullis that he believes that Mother is continuing the litigation because he wants to end their relationship. However, he

also told Ms. Mullis that he would marry Mother because it would benefit their son for them to be a family.

Ms. Mullis believes that Mother is a very passive individual with no ability to set appropriate boundaries between herself and Father. The parties are unable to have any productive type of communication or contact.

Ms. Mullis found the child to be very open and co-operative. He worries that he will be taken away from one of his parents. He deeply wishes that they could all live together as a family. He told her that he has tried everything to get his parents back together but does not know what else to do. Michael appears to have a strong, healthy bond with both parents and views them equally capable of caring for him. The child told Ms. Mullis that "My daddy thinks that my mommy does not like my daddy."

Ms. Mullis thinks that both parents are able to provide a secure and loving household for Michael. However, she believes that they must do whatever it takes to cease all contact and communication between each other for at least one year in order to disengage and to provide care for their son without manipulation due to their own personal problems. Ms. Mullis believes that this can occur only if one parent is designated as having sole legal custody. She recommends that the custodian be Mother. Ms. Mullis thinks that Mother has a somewhat better ability than Father to make decisions concerning the child. Since Mother is less controlling she would be more likely to follow any recommendations.

Ms. Mullis recommends that exchanges of the child occur at a neutral location and prefers that a neutral party be present during the exchanges. Ms. Matz testified that she would be willing to facilitate custody exchanges. Telephone contact should be limited to emergencies. A journal should be kept and exchanged by the parties

for communication purposes. Ms. Mullis also suggests that both parties should receive counseling; Father should address his controlling behavior and Mother should address her passive inability to set appropriate limits when Father uses controlling techniques. The court notes that Mother has already engaged in counseling.

In custody disputes the controlling question and paramount concern of the court is the best interests of the child; all other considerations are deemed subordinate to the child's physical, intellectual, moral, and spiritual well-being. *Warren v. Rickabaugh,* 410 Pa. Super. 431, 600 A.2d 218 (1991). Keeping the best interests as its polestar the court in the case sub judice must determine if joint or sole legal custody best serves Michael's interests.

The court has been presented in several instances with conflicting testimony from the parties. Where there is conflicting testimony the decision of what testimony to believe must be left to the trial judge who had the opportunity to observe the demeanor of the witnesses and actually hear the testimony. *Nancy E.M. v. Kenneth D.M.,* 316 Pa. Super. 351, 462 A.2d 1386 (1983).

Mother presented a much more truthful demeanor and proffered more consistent testimony than Father did. Father did not deny many of Mother's allegations, but he made weak excuses for his actions or tried to justify his unreasonable behavior as the actions of a devoted parent. He conveniently forgot certain facts, such as his criminal record. Although Father testified that it was he who wanted to end his physical relationship with Mother rather than Mother who did, the facts bear out Mother's version. He, himself, told Ms. Mullis that he wanted to marry Mother. That is not the statement of a person who wants to terminate a relationship. In

addition, Michael told Ms. Mullis that Father believes that Mother does not like him. For these reasons, the court resolved the issues of credibility in Mother's favor.

The court is mandated to consider the uncontradicted testimony of an expert. *Rinehimer v. Rinehimer,* 336 Pa. Super. 446, 485 A.2d 1166 (1984). Ms. Mullis believes that it is in Michael's best interests to have Mother as his sole legal guardian. Father presented himself to the court and Ms. Mullis as an extremely angry, controlling man. Michael is his son and he will do as he pleases regardless of Mother's desires or what the court orders. It is uncontroverted that Father believes that he has the absolute right to have Michael whenever Michael is not in Mother's custody. He, thus, has done whatever he needed to do in order to ensure that this goal is not thwarted by court orders or people. Father cannot obey a court order or compromise his position.

A successful joint custody arrangement requires that the parents be able to isolate their personal conflicts from the roles as parents and that the child be spared whatever resentments and rancor the parents may harbor. *Brown v. Eastburn,* 351 Pa. Super. 479, 506 A.2d 449 (1986).

Father clearly cannot cooperate with Mother. He cancels Michael's medical appointments. He demands or takes custody beyond his designated custodial periods even though he enjoys a significant amount of time under the order. He harasses Mother and Ms. Matz with telephone calls. He intimidates Mother and her family with his conduct. The court therefore finds that Father does not possess the minimum degree of the spirit of cooperation necessary to have a shared custody arrangement work. *Murphey v. Hatala,* 350 Pa. Super. 433, 504 A.2d 917 (1986). For that reason the court finds that Mother should be Michael's sole legal custodian.

Both parties love Michael and want to be a major force in his life. Michael loves both his parents and wants to spend as much time with each as possible. He is confused by his parents' relationship and harbors hope that they will live together again as a family. The court believes that Father encourages Michael to foster this sentiment.

The court will not limit Father's access to the child. It is clear that Father and Michael love each other, have bonded well, and want to spend time together. The court notes, however, that custody orders must be obeyed and the court will not take it lightly if Father disobeys the order it enters. Contempt will result in serious sanctions and could even result in restrictions to Father's physical custody of the child.

In accordance with the foregoing opinion, the court enters the following order:

## ORDER

And now, June 7, 1996, it is hereby ordered as follows:

(1) Defendant, Susan Matz, shall have sole legal and primary physical custody of the minor child, Michael Lee Nowotarski, date of birth, May 28, 1990. In making any decisions concerning the child, Mother shall give due consideration to the opinions of plaintiff, Michael L. Nowotarski but is not bound by them.

(2) The custody schedule of the child during the school year is as follows:

(a) Mother shall have custody of the child Monday through Friday from 6 p.m. until 8 a.m. or until the school bus picks him up at Mother's residence. If Mother is not working during the hours school is not in session

she shall retain custody of the child during those periods if she desires.

(b) Mother shall have custody of the child on alternate weekends from Fridays at 6 p.m. until Mondays at 8 a.m.

(c) Father shall have custody of the child Monday through Friday from the end of school until 6 p.m. Father has the option to pick the child up at school. If the child has a holiday from school and Mother is working Father has the option to exercise his right to custody from 8 a.m. to 6 p.m. The exchange of the child shall occur at the Cumru Township Police Department or any other mutually agreed upon location.

(d) Father shall have custody of the child on alternate weekends from Saturday at 10 a.m. to Sunday at 6 p.m. The exchanges of the child shall occur at the Cumru Township Police Department or any other mutually agreed upon location.

(3) The custody schedule of the child during the summer when school is not in session is as follows:

(a) Father shall have custody of his son Monday through Friday from the time Mother drops the child off en route to work at the Cumru Township Police Department at 3:30 p.m. at which time Father shall deliver the child to the home of the maternal grandmother, Ms. Matz.

(b) If Father chooses, he may have custody of the child for an activity one evening per week until 7:30 p.m.

(c) Father shall have custody of the child the fourth weekend of June, July, and August from Saturday at 10 a.m. until Sunday at 6 p.m.

(d) Mother shall have physical custody of the child at all other times.

(4) Each party shall have custody of the child for two non-consecutive weeks in 1996 and three non-consecutive weeks thereafter unless the parties agree otherwise. Each party shall give the other party at least 30 days written notice as to his or her selections. In even numbered years Father's selections have priority if there is a conflict. In odd numbered years Mother's selections take precedence if there is a conflict.

This year Father is to have custody of the child from June 14, 1996, at the completion of school until June 17, 1996, when he delivers the child to school; June 28, 1996; and July 7, 1996, to July 14, 1996. This year Mother is to have custody of the child for two consecutive weeks at Thanksgiving for purposes of a vacation in Florida.

(5) The parties shall alternate the Christmas holiday as follows:

In even numbered years Mother shall have custody of the child from 8 a.m. on December 24 until 2 p.m. on December 25, and Father shall have custody of the child from 2 p.m. on December 25 until 6 p.m. on December 26. The parties shall alternate this schedule in even numbered years.

(6) The parties shall alternate the Thanksgiving holiday which shall commence on Thanksgiving at 8 a.m. and end on Sunday at 6 p.m. Mother shall have this holiday in even numbered years and Father shall have the holiday in odd numbered years.

(7) Father shall have custody on the following named holidays on an alternating basis between the hours of 10 a.m. and 6 p.m.: New Year's Day, Easter, Memorial Day, July Fourth, Labor Day.

(8) Notwithstanding any other provision of this order to the contrary, Mother shall have custody of the minor

child on Mother's Day, and Father shall have custody of the minor child on Father's Day.

(9) The exchange of the child may occur with the assistance of either the maternal or paternal grandparents in the event that any parent is unavailable. Each party or grandparent is to wait an additional 15 minutes at the exchange point for the other party to arrive.

(10) If any party who has custody of the child must leave the child in the care of someone else for more than four hours, the custodial parent shall contact the non-custodial parent to determine if that parent wants to care for the child in the custodial parent's absence.

(11) Both parties shall have the following rights with respect to the child: reasonable telephone calling privileges limited to one call per day except when the child is ill; access to report cards and other relevant information concerning the progress of the child in school; and both parties shall provide to the other all information as much in advance as possible, concerning any matter respecting the child so as to provide the other parent ample opportunity to participate and/or attend official functions and/or educational appointments.

(12) In the event of any serious illness of the child at any time, the party then having custody of the child shall immediately communicate with the other party by telephone or any other means, informing the other party of the nature of the illness. During such illness, each party shall have the right to visit with the child as often as he or she desires, consistent with the proper medical care of said child. The word "illness" as used herein shall mean any disability which confines the child to bed under the direction of a licensed physician for a period in excess of 48 hours.

(13) The parties are ordered to commence counseling as soon as Mother's counselor certifies that she is ready

to counsel with Father. Said counseling is to be undertaken with a mutually agreed upon counselor, or failing agreement with Dr. Peter Thomas, for the purpose of facilitating the growth of all parties towards improving communication and cooperation between themselves and better parenting by both parties. A report is to be made available to the court upon the completion of the counseling. Each party is responsible for his or her own costs regarding the payment for these sessions. Professional reports are to be made available to this court periodically and upon cessation of the counseling. The counselor shall determine the number of sessions which he or she deems necessary.

(14) The parties shall engage a mediator/arbitrator as soon as Mother's counselor certifies that she is ready to mediate issues with Father to resolve any conflicts which arise between them in regard to the execution of this order. If the parties cannot mutually agree on a mediator/arbitrator then Edward Hanna shall be used. If after mediation a resolution cannot be reached, the decision of the mediator/arbitrator is final except that each party shall always have recourse to petition the court to determine the child's best interests in the event he or she believes that the arbitrator's decision is *clearly* not in the child's best interest. If the court finds that recourse to the court was unreasonable, then counsel fees shall be awarded against that party. Father shall pay 50 percent and Mother shall pay 50 percent of the cost of mediation/arbitration unless the mediator/arbitrator believes that a party was unreasonable, in which case the court may assess the costs against one or the other party in a different proportion.

(15) Both parties shall ensure that the child is present at all his scheduled activities. Mother may enroll the child at a summer camp during part of the summer, giving due consideration to Father's selection of a camp.

(16) For a period of six months from the date of this order, the parties shall have a "cooling-off" period during which they shall communicate by FAX machines only. Each party is responsible for buying his or her own machine and to exchange FAX numbers through their counsel within 10 days from the date of this order. The parties are to continue to use the FAX machines for communication beyond six months if they believe they cannot communicate in a civilized manner. In no event shall any contact between the parties ever be done with the child as the messenger.

(17) Neither party shall disparage or denigrate the other parent or family members in the presence of the child nor permit others to do so. Each parent will try to encourage the development of the parent-child relationship between the child and each parent.